Case No. 22-30490

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

KATELYNN MCLIN,

*Plaintiff – Appellant*

v.

TWENTY-FIRST JUDICIAL DISTRICT; ROBERT H. MORRISON, III

*Defendants – Appellees*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF LOUISIANA,
HON. BRIAN A. JACKSON, CIVIL ACTION NO. 3:21-CV-00411

## BRIEF OF DEFENDANTS-APPELLEES

Thomas M. Flanagan (La. Bar #19569)
Camille E. Gauthier (La. Bar #34558)
Dennis O. Durocher, Jr. (La. Bar #36441)
FLANAGAN PARTNERS LLP
201 St. Charles Avenue, Suite 3300
New Orleans, Louisiana 70170
Telephone: (504) 569-0235
Facsimile: (504) 592-0251
tflanagan@flanganpartners.com
cgauthier@flanaganpartners.com
ddurocher@flanaganpartners.com

Counsel for Defendants-Appellees,
Twenty-First Judicial District and Robert H.
Morrison, III

## <u>CERTIFICATE OF INTERESTED PERSONS</u>

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

1.  Katelynn McLin
    *Plaintiff-Appellant*

2.  Kevin S. Vogeltanz
    The Law Office of Kevin S. Vogeltanz, LLC
    *Counsel for Plaintiff-Appellant*

3.  The Twenty-First Judicial District
    *Defendant-Appellee*

4.  Robert H. Morrison, III
    *Defendant-Appellee*

5.  Thomas M. Flanagan
    Camille E. Gauthier
    Dennis O. Durocher, Jr.
    Flanagan Partners, LLP
    *Counsel for Defendants-Appellees*

*/s/ Thomas M. Flanagan*

## <u>STATEMENT REGARDING ORAL ARGUMENT</u>

Appellees do not request oral argument. The record is small, and the parties'

briefs fully explore the jurisdiction and merits issues in this short-lived case.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ....................................................... ii

STATEMENT REGARDING ORAL ARGUMENT ........................................... iii

TABLE OF AUTHORITIES ............................................................. viii

STATEMENT OF JURISDICTION ......................................................... xiii

I.    INTRODUCTION ................................................................. 1

II.   RESTATEMENT OF THE ISSUES ................................................... 3

III.  STATEMENT OF THE CASE ....................................................... 4

      A.    Statement of facts ................................................... 4

      B.    Procedural history ................................................... 7

IV.   SUMMARY OF THE ARGUMENT ..................................................... 8

V.    ARGUMENT ..................................................................... 10

      A.    *De novo* standard of review ........................................ 10

      B.    The 21st JD lacks juridical personality. ............................ 11

            1.    There is no constitutional basis for finding that
                  judicial districts have juridical personality. ............... 12

                  a.    The Louisiana Constitution does not grant
                        juridical personality to judicial districts ......... 12

                  b.    The Louisiana Constitution does not classify
                        judicial districts as political subdivisions ........ 14

2.     There is no statutory basis for finding juridical
       personality or procedural capacity in the
       judicial districts. ........................................................15

       a.     The legislature uses unambiguous language
              to grant procedural capacity to government
              entities; it did not do so for judicial districts. .................15

       b.     Other statutes McLin relies on say nothing
              about procedural capacity.................................................17

              i.     Title 49 governing "state administration"
                     does not endow judicial districts with
                     procedural capacity....................................................17

              ii.    The Governmental Claims Act is
                     equally inapposite....................................................20

              iii.   The Louisiana Employment
                     Discrimination Law is irrelevant
                     to determinations of procedural capacity...............22

3.     Case law uniformly finds that judicial district courts
       lack the capacity to sue or be sued. .......................................222

       a.     All three federal district courts in Louisiana
              find that judicial district courts lack
              procedural capacity. ......................................................23

       b.     A *Roberts*-style analysis does not support a
              finding of juridical personality......................................24

              i.     The 21st JD is not an autonomous,
                     self-governing entity with legal
                     authority to manage, direct, and
                     control all aspects of its existence. .......................24

              ii.    *Roberts* does not hold that Louisiana law
                     might confer upon political subdivisions

the capacity to be sued for one thing but not for another. ...................................................... 26

  c. *Griffith v. City of New Orleans* does not save McLin's claim. ................................................. 28

 4. McLin's alternative arguments are equally without merit. ........................................................ 29

  a. McLin's argument that the 21st JD's lack of juridical personality places her employer beyond the reach of Title VII is a red herring. ................ 29

  b. The 21st JD's elected judges are not an "unincorporated association" as that term is defined by the Fifth Circuit. ........................................ 31

C. In the alternative, the 21st JD, as an agency of the state, is entitled to Eleventh Amendment immunity from McLin's state-law claim. .................................................... 32

D. McLin failed to state a claim for racial discrimination against Judge Morrison. ........................................................ 39

 1. McLin's claim fails under Rule 12(b)(6). ................................. 39

 2. Even if McLin had stated a claim upon which relief can be granted, Judge Morrison would be entitled to qualified immunity on the race discrimination claim. ............................................... 45

E. Judge Morrison is entitled to qualified immunity from McLin's First Amendment retaliation claim. .................................... 46

 1. McLin's claim fails unless she meets her burden of showing that Judge Morrison is not entitled to qualified immunity .................................................. 46

 2. McLin fails to understand her burden. ..................................... 48

3.    McLin defines her asserted right too
generally ................................................................. 49

4.    McLin fails to plead facts showing that Judge
Morrison violated her right. ..................................... 50

VI.    CONCLUSION ................................................................................. 55

CERTIFICATE OF SERVICE .......................................................................... 57

CERTIFICATE OF COMPLIANCE ................................................................... 58

# TABLE OF AUTHORITIES

**Cases**

*Ashcroft v. al-Kidd*,
   563 U.S. 731 (2011) ........................................................................... 48

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ..................................................................... 11, 45

*Brady v. Fort Bend Cnty.*,
   145 F.3d 691 (5th Cir. 1998) ............................................................ 52

*Bustos v. Martini Club Inc.*,
   599 F.3d 458 (5th Cir. 2010) ............................................................ 11

*Cicalese v. Univ. of Texas Med. Branch*,
   924 F.3d 762 (5th Cir. 2019). ............................................... 41, 43, 45

*Cozzo v. Tangipahoa Par. Council-President Gov't*,
   279 F.3d 273 (5th Cir. 2002) ............................................................ 33

*Cunningham v. Castloo*,
   983 F.3d 185 (5th Cir. 2020) ....................................................... 46-47

*Darby v. Pasadena Police Dep't.*,
   939 F.2d 311 (5th Cir. 1991) ............................................................ 30

*Dejoie v. Medley*,
   2008-2223 (La. 5/5/2009), 9 So. 3d 826 ................................ 19-20, 22

*Edelman v. Jordan*,
   415 U.S. 651 (1974) ......................................................................... 33

*Est. of Davis ex rel. McCully v. City of N. Richland Hills*,
   406 F.3d 375 (5th Cir. 2005) ............................................................ 47

*Green v. District Attorney Office*,
  No. 08-3685, 2009 WL 651132 (E.D. La. Mar. 10, 2009) ................................... 24

*Griffith v. City of New Orleans*,
  Nos. Civ. A. 11-245, 11-535, 2013 WL 2555787 (E.D. La. June 10, 2013) ............ 29

*Hans v. Louisiana*,
  134 U.S. 1 (1890) .............................................................................. 33

*Houghton v. Grimes*,
  100 Vt. 99 A. 15 (1926) ....................................................................... 32

*Hudson v. City of New Orleans*,
  174 F.3d 677 (5th Cir. 1999) ........................................................... 34-35

*Johnson v. Louisiana*,
  369 F.3d 826 (5th Cir. 2004) ............................................................... 52

*Laugand v. Bank of New York Mellon*,
  No. Civ. A. 17-00083, 2017 WL 4276474 (M.D. La. Sept. 26, 2017) ................. 23

*Mitchell v. Forsyth*,
  472 U.S. 511 (1985) ........................................................................ 47

*Modica v. Taylor*,
  465 F.3d 174 (5th Cir. 2006) ................................................................51

*Moore v. Fourth Dist. Ct. Morehouse Par.*,
  No. CIV.A. 12-0364, 2012 WL 1391652 (W.D. La. Mar. 9, 2012)....................... 23

*Morrow v. Meachum*,
  917 F.3d 870 (5th Cir. 2019)............................................................... 48

*Penrod Drilling Co. v. Johnson*
  414 F.2d 1217 (5th Cir. 1969) ............................................................. 32

*Pickering v. Bd. of Ed. of Twp. High School District 205, Will Cnty., Il.*,
    391 U.S. 563 (1968) ........................................................................... 49-50

*Pierce v. Smith*,
    117 F.3d 866 (5th Cir. 1997) ................................................................ 47

*Porche v. St. Tammany Parish Sheriff's Office*,
    67 F. Supp. 2d 631 (E.D. La. 1999) ...................................................... 33

*Ramming v. United States*,
    281 F.3d 158 (5th Cir. 2001) ................................................................ 10

*Roberts v. Sewerage and Water Bd. of New Orleans*,
    92-2048 (La. 1994), 634 So. 2d 341 ...............................................*passim*

*Rutherford v. Louisiana*,
    No. Civ.A. 10-1987, 2011 WL 692031 (E.D. La. Feb. 17, 2011) ........................ 23

*Swierkiewicz v. Sorema N.A.*,
    534 U.S. 506 (2002). ........................................................................... 41

*Vincent v. City of Sulphur*,
    805 F.3d 543 (5th Cir. 2015) ................................................................ 48

*Williams v. Kansas State Dep't of Soc. & Rehab. Serv.*,
    No. 14-CV-01663, 2014 WL 6065613 (E.D. La. Nov. 12, 2014) ........................ 24

*Yarls v. Bunton*,
    905 F.3d 905 (5th Cir. 2018) .................................................................11

## Statutes

La. Civ. Code art. 9 ................................................................................. 16

La. Const. art. 5.................................................................................. 12, 26

La. Const. art. 6...................................................................................... 14

La. Const. art. 12 ...................................................................... 36

La. Rev. Stat. § 13:477 ............................................................ 16

La. Rev. Stat. § 13:996.6 .....................................................18, 38

La. Rev. Stat. § 13:996.68 ................................................. 26, 38

La. Rev. Stat. § 13:5101 ......................................................... 20

La. Rev. Stat. § 13:5102 ......................................................... 21

La. Rev. Stat. § 13:5109 ......................................................... 36

La. Rev. Stat. § 13:5522 ....................................................37, 39

La. Rev. Stat. § 13:5560 ......................................................... 37

La. Rev. Stat. § 23:302 ........................................................... 22

La. Rev. Stat. § 33:4713 ......................................................... 39

La. Rev. Stat. § 36:401 ...........................................................15

La. Rev. Stat. § 39:1533 ......................................................... 36

La. Rev. Stat. § 42:1441 ......................................................... 36

La. Rev. Stat. § 46:1060 ....................................................15, 25

La. Rev. Stat. § 49: 308 .......................................................17-18

La. Rev. Stat. § 40:1491...........................................................17

La. Rev. Stat. § 40:1500 .........................................................17

**Rules**

Fed. R. Civ. P. 8(a)(2) ............................................................ 41

Fed. R. Civ. P. 12(b)(1) ........................................................... 10

Fed. R. Civ. P. 12(b)(6) ....................................................*passim*

La. Dist. Ct. Rule 4.1 ...............................................................13

**Other Authorities**

*Black's Law Dictionary* (9th ed. 2010) .......................................13

## STATEMENT OF JURISDICTION

Plaintiff-appellant, Katelynn McLin, asserted Title VII, 42 U.S.C. § 1981, and state-law claims against the Twenty-First Judicial District and its former chief judge, Robert H. Morrison, III. Although the Title VII and 42 U.S.C. § 1981 claims implicated federal question jurisdiction with respect to Judge Morrison, the district court lacked subject matter jurisdiction over the Twenty-First Judicial District because it (1) lacks the capacity to be sued and, alternatively, (2) enjoys Eleventh Amendment immunity from the plaintiff's state-law claim.

## <u>BRIEF OF DEFENDANTS-APPELLEES</u>

The defendants/appellees, Twenty-First Judicial District ("21st JD") and Judge Robert H. Morrison, III (retired), respond to the plaintiff/appellant's appeal of the district court's judgment dismissing her complaint.

## I.    INTRODUCTION

The plaintiff is a Caucasian woman who sued a state "judicial district," her ostensible employer, and its former chief judge. Invoking federal and state law, she contends that, after using an inoffensive, race-neutral term with a co-worker, her employment ended. The termination of employment coincided with the co-worker's discovery of a Facebook post by the plaintiff. In that post, she mentioned her powerful truck and threatened to run over civil rights protesters blocking roadways, as once happened in the wake of George Floyd's death in police custody. According to the plaintiff, had she been a different race, her employment would have remained secure. The district court dismissed the plaintiffs' claims under Rule 12, and she appeals. Because the dismissal was correct, this Court should affirm.

The plaintiff sued the judicial district under Title VII and a state law that prohibits employers from retaliating against employees for their political activity. But suing the judicial district assumed that it had procedural capacity. That assumption was false. Although the judicial power of Louisiana, exercised by judges at various

levels, is arranged by geographic areas called *districts*, those areas lack juridical personality. Several courts have ruled that suits against judicial district *courts* likewise fail on this basis. Because a mere judicial district lacks the capacity to sue or be sued, the district court properly dismissed the plaintiff's claims.

The claims against the former chief judge personally, under 42 U.S.C. § 1981, fared no better. For starters, the plaintiff failed to allege plausible facts showing that her discharge turned on her race. While she claimed that fellow employees had engaged in "political activity" and avoided discipline, she failed to allege that anyone did anything remotely like what she did. Though the plaintiff insists that, in her mind, race was the real factor motivating the judge, her subjective feelings were not enough to make that claim plausible.

The plaintiff also claimed that the judge violated her First Amendment rights by retaliating against her for threatening civil rights protesters. That claim, brought under 42 U.S.C. § 1983, required her to overcome the judge's qualified immunity. But the plaintiff could not show that, under clearly established law, she had a right to threaten peaceful protesters with physical harm. Nor could she show that, as an employee supporting the work of the state courts, her interest in speaking her mind outweighed the institutional interests in preserving the internal cohesion, integrity, and reputation of the judicial system. While the plaintiff attempts to flip the burden

on appeal, citing governing law on these points was her burden—not the judge's.

This individual claim, like the claim against the judicial district, lacked merit. This

Court should affirm.

## II.  RESTATEMENT OF THE ISSUES

A.  **Lack of capacity**. Unless the State of Louisiana has taken explicit steps to grant a purported agency with procedural capacity, third parties may not sue the agency. Neither the Louisiana Constitution nor statutes grant procedural capacity to the 21st JD. Did the district court correctly rule that the 21st JD lacked the capacity to be sued?

B.  **Eleventh Amendment (in the alternative)**. Eleventh Amendment immunity applies to state agencies that are arms of the state, but it does not apply to political subdivisions and other local government entities. The source of an entity's funding is the most important factor in classifying entities for this purpose, but Louisiana judicial districts, unlike political subdivisions and other local governments, are not authorized to pay money judgments—making them dependent on the State for that purpose. Are judicial districts, if they are entities at all, arms of the state and thus entitled to Eleventh Amendment immunity with respect to state–law claims brought in federal court?

C.  **Failure to state a plausible claim**. Plaintiffs are not required to plead a prima facie case to state a claim upon which relief may be granted, but district courts may use the elements of a prima facie case as a framework for determining whether plaintiffs have stated a claim. The district court used the elements of a prima facie case as a framework for evaluating McLin's race-discrimination claim but found that her allegations lacked sufficient detail to make them plausible. Did the district court correctly dismiss the claim against Judge Morrison (and, if reached, against the 21st JD)?

**D.**    **<u>Qualified immunity</u>**. Qualified immunity protects government officials from suit unless a plaintiff pleads facts that, if true, would constitute a violation of a "well established" constitutional right. No court has held that making threats to run over Black Lives Matter protesters is a constitutional right, nor has a court ever held that a judicial employee's interest in making such a threat outweighs the judiciary's interest in promoting efficiency in its operations. Did the district court correctly rule that the plaintiff failed to plead sufficient facts to overcome Judge Morrison's qualified immunity?

## III.    STATEMENT OF THE CASE

### A.    Statement of facts

Plaintiff, Katelynn McLin, is a 23-year-old white woman.[1] She began working at the Twenty-First Judicial District as a collections officer in October 2019.[2] Her employment was "at will" and "subject to termination by either the Court or the employee at any time, for any reason not prohibited by law."[3] Chief Judge Robert Morrison, III was "[the] ultimate decision-maker at work and on behalf of employer."[4] In her year of employment with the court, McLin "never received written or verbal discipline" and "was selected for a promotion, given a raise, and given a commendation letter approximately one month prior to her termination."[5]

---

[1]    ROA.99, ¶ 20, plaintiff's first amended, restated, and superseding complaint.

[2]    ROA.99, ¶ 21.

[3]    ROA.103, ¶¶ 45-46.

[4]    ROA.112, ¶ 121.

[5]    ROA.99, ¶¶ 22-23.

McLin attended a lunch meeting for judicial support staff in November 2020.[6] McLin sat next to "T.D.," an African-American colleague.[7] When it was time to leave, McLin told T.D. that she had to return to work to "deal with the LPians."[8] The coworker questioned her use of the term "LPian," asking her to explain what it meant.[9] McLin insists that the term was not "objectively or intended to be offensive, racially charged, or antagonistic in any possible sense."[10] McLin believes the coworker nevertheless reported the exchange to her supervisor, a judge in the 21st JD.[11]

After the lunch, T.D. looked at McLin's public Facebook posts.[12] She found a post in which McLin referenced a news story about the driver of truck/horse trailer who plowed through a group of civil-rights protesters "rallying in the wake of George Floyd's murder."[13] In the post, McLin commented approvingly and mentioned her own truck/trailer: "All I'm going to say is that Silver Duramax  enjoys pulling that

---

[6]    ROA.104, ¶ 57.

[7]    ROA.104, ¶ 59.

[8]    ROA.105, ¶ 61.

[9]    ROA.105, ¶ 63.

[10]    ROA.105, ¶ 66.

[11]    ROA.107, ¶ 83.

[12]    ROA.106, ¶ 73.

[13]    ROA 106-107, ¶¶ 74-75, 83.

black horse trailer at 80mph."[14] The comment concludes with the emoji "🥴" and the hashtag "#IWillrunYouOver."[15]

McLin believes T.D reported her use of the term "LPian" and the Facebook post to her supervising judge,[16] who then brought the matter to Judge Morrison.[17] Judge Morrison allegedly directed the judicial administrator to terminate McLin's employment.[18] McLin alleges that the administrator expressed regret at having to dismiss her, stating: "I hate having to do this" and "[I] had no other choice."[19] She contends that Judge Morrison's decision was based on her Facebook post and her comment to T.D.[20] She alleges that Judge Morrison told her: "In today's world that we live in, I have no other choice but to terminate you. You need to watch what you say and do."[21]

---

[14]    ROA.106, ¶ 76.

[15]    ROA.106, ¶ 76.

[16]    ROA.107, ¶ 83.

[17]    ROA.107, ¶ 86.

[18]    ROA.108, ¶ 88.

[19]    ROA.108, ¶ 90.

[20]    ROA.108, ¶ 94.

[21]    ROA.108, ¶ 95.

McLin speculates that Judge Morrison would not have discharged her had she not been white and had she not engaged in what she calls "political speech" on Facebook.[22] McLin further believes that colleagues in the 21st JD (including T.D.) engaged in public commentary but were not terminated or disciplined.[23]

## B.    Procedural history

On April 14, 2021, McLin filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"), alleging that the 21st JD unlawfully terminated her based on her race in violation of Title VII.[24] On April 20, 2021, the EEOC issued a right to sue letter.[25] McLin filed suit in the Middle District for Louisiana on July 18, 2021,[26] asserting four claims:

(1)    disparate treatment based on race under Title VII, against the 21st JD;[27]

(2)    disparate treatment based on race in violation of 42 U.S.C. § 1981, against Judge Morrison;[28]

(3)    unlawful termination for "political activity" in violation of La. Rev. Stat. § 23:961, against the 21st JD;[29] and

---

[22]    ROA.108-109, ¶¶ 97, 99.

[23]    ROA.110, ¶¶ 104-110.

[24]    ROA.98-99, ¶ 17.

[25]    ROA.99, ¶ 18.

[26]    ROA.6.

[27]    ROA.113, ¶¶ 128-135.

[28]    ROA.116, ¶¶ 136-142.

[29]    ROA.118, ¶¶ 143-150.

(4)    unlawful termination in retaliation for engaging in protected speech in violation of the First Amendment to the U.S. Constitution, against Judge Morrison.[30]

The defendants sought dismissal under Rules 12(b)(1) and (6). The complaint was amended before a ruling, and the defendants re-urged their motion to dismiss. After full briefing, the district court dismissed all claims.[31] With respect to the two claims against the 21st JD, the district court concluded it lacked capacity to sue or be sued and dismissed the claims.[32] The claims against Judge Morrison were likewise dismissed: (1) the unlawful disparate treatment claim, under Rule 12(b)(6) for failure to state a claim,[33] and (2) the First Amendment retaliation claim, based on Judge Morrison's qualified immunity.[34] This appeal followed.

## IV.    SUMMARY OF THE ARGUMENT

The district court correctly dismissed McLin's claims against the 21st JD. Louisiana's judicial districts are not entities to which the law attributes personality. Consequently, they lack the capacity to sue and be sued. Juridical personality exists in state entities only if the legislature explicitly grants it or if the entity is so separate

---

[30]    ROA.119, ¶¶ 151-157.

[31]    ROA.208.

[32]    ROA.212-215.

[33]    ROA.219-220.

[34]    ROA.225.

and distinct from other government entities that it has the legal capacity to function independently. Judicial districts do not function independently. In the alternative, if this Court determines judicial districts do possess juridical personality, the districts' lack of independence means they are part of the greater body of the judicial branch of Louisiana's state government. As such, judicial districts are entitled to Eleventh Amendment immunity from state-law claims.

The district court was also correct to dismiss McLin's claims against Judge Morrison. McLin failed to allege facts that, if proven true, would show disparate treatment based on race. Instead, McLin pled her beliefs about what the judge was really thinking when he let her go, and she pled her beliefs—unsupported by allegations of fact—about the conduct of other employees. A plaintiff's beliefs alone are insufficient to overcome a Rule 12(b)(6) motion to dismiss. The district court correctly dismissed the plaintiff's race-discrimination claims on this basis. The same result should have applied to the 21st JD if it had procedural capacity. That is an alternate basis to affirm as to the 21st JD.

McLin also failed to meet her pleading burden with respect to qualified immunity. She cited no case law showing that threatening to run over Black Lives Matter protesters is a well-established constitutional right. Nor did McLin plead facts showing that her interest in commenting on civil rights protesters in the way she did

outweighed the judicial district's interest in promoting efficiency—an essential element of proving a violation of the asserted right. Because McLin's complaint failed to allege facts to overcome Judge Morrison's qualified immunity, the district court was right to dismiss the claims against him.

## V.  ARGUMENT

The Court should affirm the district court's dismissal of McLin's claims against the 21st JD and Judge Morrison.

### A.  *De novo* standard of review.

This Court evaluates *de novo* a district court's grant of a Rule 12(b)(1) motion for dismissal applying the same standard used by the district court.[35] Motions filed under Rule 12(b)(1) allow a party to challenge the subject matter jurisdiction of the district court to hear a case.[36] The burden of proof is on the party asserting jurisdiction.[37] When a Rule 12(b)(1) motion is filed in conjunction with other Rule 12 motions, the court should consider the Rule 12(b)(1) jurisdictional attack before addressing any attack on the merits.[38]

---

[35]     *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001).

[36]     *Id.* (citing Fed. R. Civ. P. 12(b)(1)).

[37]     *Id.*

[38]     *Id.*

This Court also reviews *de novo* a district court's dismissal under Rule 12(b)(6).[39] "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"[40] Facial plausibility exists "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."[41] When conducting its inquiry, the court must "accept[] all well-pleaded facts as true and view[] those facts in the light most favorable to the plaintiff."[42] The Court may affirm a district court's Rule 12(b)(6) dismissal on any grounds supported by the record.[43]

### B. The 21st JD lacks juridical personality.

The district court was correct to dismiss McLin's claims against the 21st JD because it lacks juridical personality and the capacity to sue or be sued. Federal Rule of Civil Procedure 17 provides that for all parties except individuals and corporations, capacity to sue or be sued is determined by the law of the state where the court is located.

---

[39]   *Bustos v. Martini Club Inc.*, 599 F.3d 458, 461 (5th Cir. 2010).

[40]   *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

[41]   *Id.*

[42]   *Bustos*, 599 F.3d at 461 (5th Cir. 2010).

[43]   *Yarls v. Bunton*, 905 F.3d 905, 909 (5th Cir. 2018).

1.     **There is no constitutional basis for finding that judicial districts have juridical personality.**

a.     **The Louisiana Constitution does not grant juridical personality to judicial districts.**

Judicial power in Louisiana is created through the state's constitution and vested in a supreme court, courts of appeal, district courts, and other courts of limited jurisdiction.[44] Judicial power is thus vested in the district courts, not the judicial districts. The constitution provides that "[t]he state shall be divided into judicial districts, each composed of at least one parish and served by at least one district judge."[45] The article creating the judicial districts does not grant them juridical personality or vest them with power of any kind. Rather, they are geographic areas whose sole attributes are that they consist of at least one parish and are served by at least one judge.

Constitutional provisions governing judicial functions at the district level are focused exclusively on the district courts, not the judicial districts. Article 5 § 16, for example, establishes the jurisdiction of the district courts,[46] and says nothing about judicial districts. Additionally, district courts, not judicial districts, are subject to the

---

[44]     LA. CONST. art. 5 § 1.

[45]     *Id.* art. 5 § 14.

[46]     *See, e.g.*, art. 5 § 16(A)(1) ("[A] *district court* shall have original jurisdiction of all civil and criminal matters.") (emphasis added).

supervisory jurisdiction of a supreme court empowered to establish procedural and administrative rules not in conflict with law.[47] To recognize juridical personality in the judicial districts would be to recognize a judicial power exempt—even if by omission—from oversight by the supreme court. That result would be inconsistent with the constitutionally mandated structure of Louisiana's judiciary.

In terms of administrative rule-making—the only self-governance that can be said to exist at the district level—the district courts have rule-making authority to the extent the supreme court allows it.[48] No rule-making authority is granted the judicial districts.

This dichotomy between *districts* and *courts* is not a distinction without a difference. In a general sense, *court* is defined as a "governmental body consisting of one or more judges who sit to adjudicate disputes and administer justice" or as the "judge or judges who sit on such a governmental body."[49] In contrast, a *district* is a "territorial area into which a country, state, county, municipality, or other political

---

[47]    *Id.* art. 5 § 5 ("The supreme court has general supervisory jurisdiction over all other courts. It may establish procedural and administrative rules not in conflict with law and may assign a sitting or retired judge to any court.").

[48]    La. Dist. Ct. Rule 4.1 ("The court en banc may appoint and fix the salary of a judicial administrator to assist the court in fulfilling its administrative obligations."), *available at* https://www.lasc.org/District_Court_Rules?p=TitleI.

[49]    *Black's Law Dictionary* 323 (9th ed. 2010).

subdivision is divided for judicial, political, electoral, or administrative purposes."[50]

The district court consists of the judge or judges who exercise jurisdiction. The judicial district is the geographic area within which that jurisdiction is exercised.

> **b.  The Louisiana Constitution does not classify judicial districts as political subdivisions.**

McLin asserts that judicial districts are political subdivisions with the capacity to be sued.[51] The judicial districts are not, however, political subdivisions in the way the constitution defines that term: "'Political subdivision' means a parish, municipality, and any other unit of local government, including a school board and a special district, authorized by law to perform governmental functions."[52] "Judicial district" is not included in the definition of "political subdivision." Moreover, the definition of "political subdivision" is part of article six of the constitution, which establishes and defines the powers and limits of local governments.

The powers granted to political subdivisions further clarify their classification as local manifestations of executive branch power. For example, "[a] political subdivision may exercise the power of taxation, subject to limitations elsewhere provided by this constitution, under authority granted by the legislature for parish, municipal,

---

[50]     *Id.* at 426.

[51]     McLin Brief, p. 33.

[52]     LA. CONST. art. 6 § 44.

and other local purposes, strictly public in their nature."[53] Judicial districts have no

such power. There is no constitutional basis to conclude that judicial districts are

political subdivisions.

> ### 2. There is no statutory basis for finding juridical personality in the judicial districts.

> #### a. The legislature uses unambiguous language to grant procedural capacity to government entities; it did not do so for judicial districts.

Absence of juridical personality in the judicial districts is underscored by Lou-

isiana statutory law, which does not give procedural capacity to judicial districts.

When the legislature creates an entity with procedural capacity, it does so with clear

language. For example, "[t]he Department of Public Safety and Corrections

('DPSC') is created and shall be a body corporate with the power to sue and be

sued."[54] In contrast to this explicit grant of procedural capacity is the statute creating

the 21st JD: "[t]here shall be forty-one judicial districts in the state and each district

---

[53]     *Id.* art. 6 § 30(A).

[54]     La. Rev. Stat. § 36:401(A); *see also* La. Rev. Stat. § 46:1060 ("Any hospital service district
thus created and named by any police jury or any parish in the state shall constitute a body
corporate in law with all the powers of a corporation, shall have perpetual existence, shall
have the power and right to incur debts and contract obligations, to sue and be sued, and to
do and perform any and all acts in its corporate capacity and its corporate name necessary
and proper for the carrying out of the objects and purposes for which the hospital service
district was created.").

shall be composed as follows: The parishes of Tangipahoa, Livingston, and St. Helena shall compose the Twenty-First District."[55] The explicit language identifies a geographic area; there is no grant of juridical personality or procedural capacity.

When a law is clear and unambiguous and its application does not lead to absurd consequences, the law shall be applied as written and no further interpretation may be made in search of the intent of the legislature.[56] Laws on the same subject matter must be interpreted in reference to each other.[57] The statutes creating the DPSC and the 21st JD are clear and unambiguous. Importantly, the statute creating the DPSC grants that department the capacity to sue and be sued. The statute creating the 21st JD provides no such capacity. Given Louisiana law on statutory interpretation and the plain language of the above cited laws, the inquiry should be at an end.

McLin cites statutes creating hospital and fire protection districts in support of her assertion that the 21st JD is a proper defendant.[58] She fails to explain how legislation expressly giving hospital and fire protection districts the capacity to sue and

---

[55]    La. Rev. Stat. § 13:477(21).

[56]    La. Civ. Code art. 9.

[57]    *Id.* art. 13.

[58]    McLin Brief, p. 35 ("But the idea that a governmental 'district' is a juridical, political subdivision is otherwise unremarkable under Louisiana law. For instance, Louisiana's so-called 'Fire Protection Districts' created by Louisiana statute. La. Rev. Stat. Ann. §

be sued means that a judicial district—with no equivalent legislative grant of procedural capacity—should be treated the same. The conclusion is contrary to basic rules of statutory interpretation and should be rejected.

### b.  Other statutes McLin relies on say nothing about procedural capacity.

McLin cites several other statutes in support of her assertion that the 21ˢᵗ JD is a political subdivision with procedural capacity to be sued. Her reliance on authority other than Title 13 of the Louisiana Revised Statutes is telling. With no statutory authority on point, McLin tries to cobble together a rule of law that might keep her case alive.

### i.  Title 49 governing "state administration" does not endow judicial districts with procedural capacity.

McLin cites a Title 49 provision addressing how money received by various state entities is to be handled.[59] La. Rev. Stat. § 49: 308(A)(7) provides that "political subdivisions" are not required to immediately deposit all money received by them into the state treasury.[60] And the statute defines "political subdivision," *for the limited*

---

40:1491 (so providing). These districts are expressly capable of suing and being sued in their own name. La. Rev. Stat. Ann. § [40:]1500(A).").

[59]   *Id.* at p. 33.

[60]   La. Rev. Stat. § 49:308(A)(7) ("All money received by the state or by any state board, commission, or agency shall be deposited immediately upon receipt in the state treasury, except that received: By a levee district or political subdivision, unless the full faith and credit of

*purposes of R.S. 49:308(A)(7)*, as including any judicial district.[61] McLin concludes

that "[a]lthough Section 49:308 is an admittedly niche revenue statute, the Louisiana

legislature's explicit decision to define 'judicial district' as a 'political subdivision'

is perhaps dispositive to the issue."[62]

     The plain language of the statute counsels otherwise. If the legislature had in-

tended to classify judicial districts as political subdivisions for all purposes, it would

not have limited the classification in the way it did. This statute classifies judicial

districts as political subdivisions for one narrow purpose. It is, as McLin observes,

"an admittedly niche revenue statute."[63]

     McLin's argument is not salvaged by her reliance on *Dejoie v. Medley*, a gender

and pregnancy-discrimination case brought under the Louisiana Employment Dis-

crimination Law ("LEDL").[64] The sole issue in *Dejoie* was whether the plaintiff, who

---

    the state is pledged to the payment of the bonds of the levee district or political subdivi-
    sion.").

[61]  La. Rev. Stat. § 49:308(F) ("Political subdivision" as used in Paragraph (7) of Subsection A of this Section means any judicial circuit, judicial district, office of public defender within a judicial district, school board, parish, municipality, or any other unit of local government, including a special district authorized by law to perform governmental functions."). It is perhaps an oversight on the part of the legislature to designate the judicial districts as political subdivisions even for this narrow purpose since the districts do not receive any money. The judicial expense fund is expressly designated for the court, not the district, and the judges en banc control it. *See* La. Rev. Stat. § 13:996.6.

[62]  McLin Brief, p. 34.

[63]  *Id.*

[64]  *Dejoie v. Medley*, 2008-2223 (La. 5/5/2009), 9 So. 3d 826, 827.

worked in the Orleans Parish Civil District Court, was a state employee.[65] To be classified as the employer for LEDL purposes, the entity must, among other things, receive services from the employee and provide compensation to the employee.[66] *Dejoie* noted that the plaintiff was paid by the court's "judicial expense fund."[67] By statute, there was no requirement that money coming into the judicial expense fund be deposited in the state treasury.[68] The plaintiff was paid directly by the judicial expense fund, not by the state. Thus, for purposes of the LEDL, the plaintiff did not receive compensation from the state and was not a state employee.[69]

McLin acknowledges that the supreme court did not take up the issue whether judicial districts are political subdivisions with procedural capacity. Even so, she

---

[65]    *Id.* at 827-28 ("We are called upon to determine whether plaintiff, who was employed to work with a judge of the CDC of the Parish of Orleans and who was paid compensation from funds in the JEF, is an employee of the State based on the provisions of the LEDL.").

[66]    *Id.* at 829.

[67]    *Id.* at 830.

[68]    *Id.* at 831 ("[T]he statute provides for immediate deposit of state funds, but the funds of the judicial branch, as designated in the Louisiana Constitution, and the political subdivisions as described in the statute, are excepted by the statute from the deposit requirement. Considering the above referenced provisions, we conclude the funds in the JEF are not state funds.").

[69]    *Id.* ("Simply stated, the State, for purposes of the LEDL, is not the plaintiff's employer because the State did not give compensation of any kind to her.").

urges this Court to act as though the supreme court reached that very conclusion.[70]

But the supreme court merely reiterated what La. Rev. Stat. § 49:308 plainly states: money received by the state and its various agencies must be immediately deposited in the state treasury. Judicial districts and political subdivisions are excepted from this requirement. McLin fails to explain why the legislative exemption from a requirement to deposit revenue in the state treasury endows judicial districts—who have no money anyway—with procedural capacity. Without more explicit legislative language, this Court should decline to recognize such capacity.

> ii.     **The Governmental Claims Act is equally inapposite.**

McLin's reliance on the Louisiana Governmental Claims Act ("LGCA") is equally unpersuasive.[71] McLin suggests that the LGCA's inclusion of "district" in its definition of "political subdivision," means "judicial districts" are political subdivisions.[72] McLin fails to explain why "district" necessarily includes "judicial districts."

---

[70]  McLin Brief, p. 44 ("In *Dejoie*, the Louisiana Supreme Court held this was dispositive enough for purposes of determining that the plaintiff was not a State employee. The natural, albeit unsaid, conclusion is that the plaintiff was instead an employee of a political subdivision, the Civil District Court.").

[71]  The LGCA, La. Rev. Stat. § 13:5101 *et seq.*, governs suits against the state, state agencies, and political subdivisions of the state.

[72]  McLin brief, p. 34.

Additionally, McLin fails to show that the 21st JD is a public entity to begin with. The LGCA classifies public entities, primarily for venue purposes, as state agencies or political subdivisions. With no constitutional or statutory basis for finding juridical personality, the 21st JD is neither a political subdivision nor a state agency. To the contrary, it is a geographical area within which district judges operate.

In the alternative, and only if the Court were to find that the 21st JD has juridical personality, judicial districts are more appropriately classified as state agencies than political subdivisions. A political subdivision is defined as "[a]ny parish, municipality, special district, school board, sheriff, public board, institution, department, commission, district, corporation, agency, authority, or an agency or subdivision of any of these, and other public or governmental body of any kind which is not a state agency."[73] The definition of "state agency," on the other hand, includes "any board, commission, department, agency, special district, authority, or other entity of the state."[74] A judicial district could be a "special district" or "other entity of the state," making it a "state agency."

---

[73]    La. Rev. Stat. § 13:5102(B)(1).

[74]    *Id.* § 13:5102(A).

iii.     **The Louisiana Employment Discrimination Law is irrelevant to determinations of procedural capacity.**

McLin also cites the LEDL. Her reasoning seems to be that (1) under the LEDL, an entity that pays wages and benefits for a person's work is that person's employer;[75] (2) political subdivisions can be employers under the LEDL;[76] (3) the 21st JD pays McLin's wages and benefits, so it is a political subdivision.  McLin did not sue under the LEDL, so the question of who her employer would be for LEDL purposes is not before the Court. In any case, McLin was paid out of the court's—not the district's—judicial expense fund, a fund controlled by the judges en banc. It may be that the Louisiana Supreme Court's holding in *Dejoie v. Medley* creates a situation in which plaintiffs suing the state through a judicial district under the LEDL cannot readily discern who the proper defendant is, but this is not an LEDL case. The Court should decline to find juridical personality in the judicial districts based on the LEDL or *Dejoie*.

3.     **Case law uniformly finds that judicial district courts lack the capacity to sue or be sued.**

Defendants are unaware of any case in which a judicial district was a named party to litigation. There are, however, numerous cases in which judicial district

---

[75]     McLin Brief, p. 34 (citing La. Rev. Stat. § 23:302(2)).

[76]     *Id.*

*courts* have been sued. This jurisprudence suggests that judicial districts lack juridical personality and are not proper defendants in a lawsuit.

Case law addressing the procedural capacity of the district courts is instructive. If the individuals or courts exercising judicial power lack the capacity to be sued, it stands to reason that the geographic area in which they exercise that power—the district—also lacks the capacity to be sued.

### a.     All three federal district courts in Louisiana find that judicial district courts lack procedural capacity.

McLin overlooks the cases holding that judicial district courts in Louisiana do not have the capacity to sue or be sued. The Western, Middle, and Eastern Districts of Louisiana have all addressed this issue. They have concluded that, under Louisiana law, "state judicial district courts are not persons capable of being sued."[77] McLin fails to explain why this extensive jurisprudence should be disregarded. Nor does she explain why the judicial districts, which are just geographical areas, would have capacity when the district courts themselves do not.

---

[77] *Laugand v. Bank of New York Mellon*, No. Civ. A. 17-00083, 2017 WL 4276474, *2 (M.D. La. Sept. 26, 2017); *see also Rutherford v. Louisiana*, No. CIV.A. 10-1987, 2011 WL 692031, at *5 (E.D. La. Feb. 17, 2011) ("[U]nder Louisiana law the 21st Judicial District Court is not an entity to which the law attributes personality, and it, therefore, lacks the capacity to be sued under § 1983.") (internal citations omitted); *Moore v. Fourth Dist. Ct. Morehouse Par.*, No. CIV.A. 12-0364, 2012 WL 1391652, at *3 (W.D. La. Mar. 9, 2012) ("[T]his court has recognized, on more than one occasion, that Louisiana's Fourth Judicial District Court is not a juridical person or entity capable of being sued.").

### b.   A *Roberts*-style analysis does not support a finding of juridical personality.

#### i.   The 21ˢᵗ JD is not an autonomous, self-governing entity with legal authority to manage, direct, and control all aspects of its existence.

McLin asserts that under *Roberts v. Sewerage and Water Bd. of New Orleans*, the 21ˢᵗ JD has the capacity to sue and be sued.[78] In at least two cases, courts have concluded that, "in applying the *Roberts* framework, Louisiana state courts are not juridical persons capable of being sued."[79] Moreover, the plain language of *Roberts* does not support a finding that judicial districts are juridical persons.

In *Roberts*, the Supreme Court explained that a local government unit may be deemed to have separate juridical personality when the law grants it the legal capacity to function independently.[80] The organic law does not grant judicial districts the legal capacity to function independently. In contrast to statutes creating and regulating the judicial districts are those creating entities with juridical personality. Hospital districts, for example, constitute a body corporate in law with all the powers of a

---

[78]   McLin Brief, pp. 35-38 (citing *Roberts v. Sewerage and Water Bd. of New Orleans*, 92-2048 (La. 3/21/94), 634 So. 2d 341).

[79]   *Williams v. Kansas State Dep't of Soc. & Rehab. Serv.*, No. 14-CV-01663, 2014 WL 6065613, at *3 (E.D. La. Nov. 12, 2014); *see also Green v. District Attorney Office*, No. 08-3685, 2009 WL 651132, *4-5 (E.D. La. Mar. 10, 2009).

[80]   *Roberts*, 634 So. 2d at 347 ("In the absence of positive law to the contrary, a local government unit may be deemed to be a juridical person separate and distinct from other government entities, when the organic law grants it the legal capacity to function independently and not just as the agency or division of another governmental entity.").

corporation, have perpetual existence, have the power and right to incur debts and contract obligations, to sue and be sued, and to do and perform any and all acts in their corporate capacity and their corporate name necessary and proper for the carrying out of the objects and purposes for which they were created.[81]

There is no equivalent statute granting a judicial district this range of capacity. As noted, the judicial districts are just geographical areas. The district courts, on the other hand, are subject to the control, oversight, and funding of numerous other public entities. The legislature, for example, explicitly acknowledges in the Judicial Budget and Performance Accountability Act that "the development and implementation of the budget and performance accountability system is the responsibility of the judicial system acting under the *supervisory and administrative authority* of the supreme court," and that "the development of such a system will require the cooperation of elected judges, *most of whose operating funding is provided by local governments*."[82] Additionally, the legislature approves salary increases for the judges[83] (pursuant to recommendations of the legislatively created Judicial Compensation

---

[81]     La. Rev. Stat. § 46:1060.

[82]     *Id.* § 13:81(B)(2) (emphasis added).

[83]     *Id.* § 13:47 ("Any increase in salaries may be enacted by the legislature only after submission of the aforesaid report and must be approved by a favorable vote of the majority of the elected members of each house, whether in an odd-numbered or even-numbered year, or at any extraordinary session if included within the objects of that session.").

Commission);[84] local parish or municipal governments own the buildings in which judicial district judges exercise their functions;[85] and elected officials from those parishes or municipalities are responsible for maintaining civil, criminal, and property records produced through the exercise of judicial functions.[86] The district courts do not function independently. And the judicial districts do not function at all because they are no more than geographic areas within which the district courts exercise their functions.

        ii.       **_Roberts_ does not hold that Louisiana law might confer on political subdivisions the capacity to be sued for one thing but not for another.**

McLin asserts that the "most important holding from _Roberts_ is that Louisiana law might confer upon a political subdivision the capacity to be sued for one thing,

---

[84] *Id.* § 13:46(A)-(B) ("The commission shall make a study of the salaries payable to judges. The commission shall submit its recommendations concerning judges' salaries to the legislature sixty days prior to the commencement of any regular session of the legislature in an even-numbered year. Thereafter, a report may be submitted every two years at any regular session of the legislature in an even-numbered year. The report shall be submitted to the offices of the speaker of the House of Representatives and the president of the Senate, who shall distribute copies to each member of their respective house of the legislature.").

[85] *See, e.g.*, La. Rev. Stat. § 13:996.68(C)-(D) creating a judicial building fund for the purposes of "the design, acquisition, construction, renovation, equipping, operation, and maintenance of a new Livingston Parish courthouse to be located in the parish of Livingston." The statute further provides that "the Livingston Parish Council, as governing authority of the parish of Livingston, shall have ownership and control over the Livingston Parish Courthouse Fund."

[86] LA. CONST. art. 5 § 28 ("In each parish a clerk of the district court shall be elected for a term of four years. He shall be ex officio notary public and parish recorder of conveyances, mortgages, and other acts and shall have other duties and powers provided by law.").

but not another."[87] McLin takes this assertion one step further, concluding that cases

holding that judicial districts do not have the capacity to be sued can be distinguished

from this case "because, under a *Roberts* style analysis, they did not concern whether

a Judicial District had capacity to be sued *for the purpose* of employment-based

torts."[88]

     *Roberts* does not hold that a political subdivision has the capacity to be sued for

one thing but not another. Rather, it holds that "[a] city of New Orleans employee,

who has received workers' compensation benefits from his employer, may maintain

his delictual action based on the same injuries against the Sewerage and Water

Board."[89] In *Roberts*, the plaintiff was a police officer employed by the City of New

Orleans.[90] He was injured in the course and scope of his duties when his patrol car

hit an open manhole, so he sued the Sewerage and Water Board in tort.[91] The Sew-

erage and Water Board argued that it did not have separate juridical personality from

the City of New Orleans and that it was, therefore, the plaintiff's employer—thus

---

[87]    McLin Brief, p. 38.

[88]    *Id.* at p. 39 (emphasis in original).

[89]    *Roberts v. Sewerage and Water Bd. of New Orleans*, 92-2048 (La. 3/21/94), 634 So. 2d 341, 352.

[90]    *Id.* at 342.

[91]    *Id.*

making Workers' Compensation benefits his exclusive remedy.[92] The Louisiana Supreme Court concluded that (1) the Sewerage and Water Board did have juridical personality separate and apart from the City of New Orleans, (2) the Sewerage and Water Board was not, therefore, the plaintiff's employer, and (3) it thus could be sued in tort as a "third person" by an employee of the City of New Orleans.

To conclude as McLin does that entities can have procedural capacity for some suits but not for others is a distortion of the *Roberts* holding. The issue in *Roberts* was whether the Sewerage and Water Board had separate juridical personality from the City of New Orleans and could therefore be considered the plaintiff's employer, not whether procedural capacity can be split or fractured depending on the nature of the suit. Unsurprisingly, McLin cites no language from the *Roberts* opinion to support her interpretation.

### c.    *Griffith v. City of New Orleans* does not save McLin's claim.

Given the overwhelming number of cases holding that district courts lack the capacity to sue or be sued, it is unsurprising that McLin cites an apparent outlier.[93] In *Griffith v. City of New Orleans*, the Eastern District of Louisiana explained, "Plaintiff's employer for purposes of Title VII is the State in one of its many forms—either

---

[92]    *Id.* at 343.

[93]    McLin Brief, pp. 40-45.

the State of Louisiana, or if not the State proper, the OPJC [Orleans Parish Juvenile Court], as an agency of the State of Louisiana, which it unarguably is, or the judges of the OPJC in their official capacities."[94] Importantly, *Griffith* did not conclude, as McLin suggests, "that OPJC could be sued, *apparently* in its own name."[95] Rather the court merely affirmed that the state, in one of its many forms, was the plaintiff's employer for purposes of Title VII. To the extent *Griffith* suggests the OPJC has capacity to sue or be sued, it is an outlier.

### 4.     McLin's alternative arguments are equally without merit.

#### a.     McLin's argument that the 21st JD's lack of juridical personality places her employer beyond the reach of Title VII is a red herring.

McLin's argument that established law with respect to a judicial district's juridical personality violates the Supremacy Clause is a red herring.[96] McLin suggests that, if she cannot sue the 21st JD, she is left with no employer to sue for her Title VII claims. And she complains that the 21st JD and Judge Morrison "have not urged a viable employer-entity to sue other than the 21st JD."[97]

---

[94] *Griffith v. City of New Orleans*, No. CIV. A. 11-245, 11-535, 2013 WL 2555787, *6 (E.D. La. June 10, 2013).

[95] McLin Brief, p. 43 (emphasis added).

[96] *Id.* at pp. 45-50.

[97] *Id.* at p. 49.

Unable to find any authority for her Supremacy Clause argument, McLin resorts to strained interpretations of case law. Under *Darby v. Pasadena Police Dep't*, when a public entity—in that case a municipality—designates itself as the proper defendant in any cause of action, Title VII does not override that decision and allow plaintiffs to sue the entity's agents who lack procedural capacity.[98] The 21st JD does not contend that there is no proper defendant for claims like McLin's, only that the 21st JD is not that proper defendant. That the 21st JD has not offered to McLin another defendant to sue does not mean it does not exist or that Louisiana has violated the Supremacy Clause. Again, as this Court clearly stated in *Darby*: "[O]ur cases uniformly show that unless the true political entity has taken explicit steps to grant the servient agency with jural authority, the agency cannot engage in any litigation except in concert with the government itself."[99] McLin has pointed to no such explicit steps. Her Supremacy Clause argument is without merit and should be rejected.

---

[98] *Darby v. Pasadena Police Dep't,* 939 F.2d 311, 314 (5th Cir. 1991) ("In short, Title VII grants Darby a cause of action. It does not, however, override Pasadena's decision that all cases, Title VII or otherwise, proceed against it as a corporate entity. Darby should have pursued his same cause of action against the entity that Pasadena designated as responsible for all city lawsuits. Title VII contains nothing to change this.") (cited in McLin Brief, p. 49).

[99] *Darby*, 939 F.2d at 313.

### b.     The 21st JD's judges are not an "unincorporated association" as that term is defined by the Fifth Circuit.

In a final attempt to skirt the rules governing procedural capacity, McLin urges the Court to classify the 21st JD's judges as an "unincorporated association," and to conclude, based on that extra-legislative classification, that the judges en banc have the capacity to be sued.[100] But the judges, en banc are not parties to this suit. In any case, McLin cites no authority for the proposition that a court may simply label the judges of a judicial district an "unincorporated association" and thereby grant them, en banc, the capacity to be sued. As the Louisiana Supreme Court has made clear, "[t]he important determination with respect to the juridical status or legal capacity of an entity is not its creator, nor its size, shape, or label."[101] Here, McLin asks the Court to grant juridical capacity to the en banc judges by changing their label from "judges en banc" to "unincorporated association." Such a ruling would contravene to the extensive authority discussed above.

Moreover, the judges are not an "unincorporated association." In *Penrod Drilling Co. v. Johnson*, this Court defined "unincorporated association" as "a body of persons acting together, without a charter, but upon the methods and forms used

---

[100]     McLin Brief, p. 51.

[101]     *Roberts v. Sewerage and Water Bd. of New Orleans*, 92-2048 (La. 1994), 634 So. 2d 341, 346.

by corporations, for the prosecution of some common enterprise,"[102] and as "fundamentally a large partnership."[103] *Penrod* also noted that Rule 17(b) concerns "partnership or other unincorporated association," thus assimilating "partnership" into the generic term of unincorporated association."[104] The judges do not act together based "upon the methods and forms used by corporations," nor are they fundamentally a large partnership. To categorize the elected judges as an unincorporated association has no support in the law. The effort should be rejected.

### C.   In the alternative, the 21st JD, as an agency of the state, is entitled to Eleventh Amendment immunity from McLin's state-law claim.

Consistent with her assertion that the 21st JD is a political subdivision, McLin asks the Court to conclude that the 21st JD is not entitled to immunity from her state-law claim under the Eleventh Amendment.[105] Insofar as the 21st JD lacks juridical personality and cannot be sued, the question is moot. Out of an abundance of caution and in the alternative, should this Court determine that the 21st JD does have juridical personality, judicial districts are constituent parts of the judicial branch, not political subdivisions.

---

[102]   414 F.2d 1217, 1222 (quoting 7 C.J.S. § 1).

[103]   *Id.* (quoting *Houghton v. Grimes*, 100 Vt. 99, 135 A. 15, 18 (1926)).

[104]   *Penrod,* 414 F.2d at 1220.

[105]   McLin Brief, pp. 52-53.

The Eleventh Amendment is rooted in a recognition that the states maintain certain attributes of sovereignty, including sovereign immunity.[106] The Supreme Court has consistently held that an unconsenting state is immune from suits brought in federal courts by its own citizens.[107] Even though a state is not a named party, a suit by private parties seeking to impose a liability that must be paid from the state treasury is barred by the Eleventh Amendment.[108] Eleventh Amendment immunity applies to state agencies that are properly characterized as arms of the state.[109] Even though political subdivisions, such as parishes, counties, and municipalities, exist at the behest of their state, the Eleventh Amendment affords them no protection.[110]

To help identify when a suit against a government entity is a suit against the state, this Court has used six factors:

(1)   Whether the state statutes and case law view the agency as an arm of the state;

(2)   The source of the entity's funding;

---

[106]   *Porche v. St. Tammany Parish Sheriff's Office*, 67 F. Supp. 2d 631, 632 (E.D. La. 1999) (quoting *Hans v. Louisiana*, 134 U.S. 1 (1890)).

[107]   *Id.* (quoting *Edelman v. Jordan*, 415 U.S. 651, 662 (1974)).

[108]   *Id.* (quoting *Edelman*, 415 U.S. at 662).

[109]   *Id.* at 632-33; *see also Cozzo v. Tangipahoa Par. Council-President Gov't*, 279 F.3d 273, 280–81 (5th Cir. 2002) ("When a state agency is the named defendant, the Eleventh Amendment bars suits for both money damages and injunctive relief unless the state has waived its immunity.").

[110]   *Id.*

(3)   The entity's degree of local autonomy;

(4)   Whether the entity is concerned primarily with local as opposed to statewide problems;

(5)   Whether the entity has the authority to sue and be sued in its own name; and

(6)   Whether the entity has the right to hold and use property.[111]

A defendant need not possess each of these attributes to benefit from the Eleventh Amendment.[112] Nor are these factors equal. The second is the most important.[113]

With respect to the first factor, this Court takes into account "how the state, through its constitution, laws, judicial opinions, attorney general's opinions, and other official statements, perceives the entity in question."[114] Nothing in the Louisiana constitution suggests judicial districts are political subdivisions.[115] Statutorily, judicial districts are political subdivisions only for the narrow purpose of exempting them from the requirement of depositing certain funds into the state treasury.[116] Judicial districts have none of the other powers statutorily granted to political subdivisions.

---

[111]   *Hudson v. City of New Orleans*, 174 F.3d 677, 681 (5th Cir. 1999).

[112]   *Id.* at 681-682.

[113]   *Id.* at 682.

[114]   *Id.* at 683.

[115]   *See supra* Part V.B.1.

[116]   *See supra* Part V.B.2.b.i.

The second factor is the source of entity's funding.[117] This examination is conducted to determine whether a judgment against it will be paid with state funds.[118] The Court conducts inquiries into, first and most importantly, the state's liability in the event there is a judgment against the defendant, and second, the state's liability for the defendant's general debts and obligations.[119] This analysis reinforces the conclusion that judicial districts are not political subdivisions.

The Louisiana Constitution provides, "[n]o judgment against the state, a state agency, or a political subdivision shall be exigible, payable, or paid except from funds appropriated therefor by the legislature or by the political subdivision against which the judgment is rendered.[120] This constitutional requirement is mirrored in statute:

> Any judgment rendered in any suit filed against the state, a state agency, or a political subdivision, or any compromise reached in favor of the plaintiff or plaintiffs in any such suit shall be exigible, payable, and paid only out of funds appropriated for that purpose by the legislature, if the suit was filed against the state or a state agency, or out of funds appropriated for that purpose by the named political subdivision, if the suit was filed against a political subdivision.[121]

---

[117]   *Hudson*, 174 F.3d at 686.

[118]   *Id.*

[119]   *Id.* at 687.

[120]   LA. CONST. art. 12 §10(C).

[121]   La. Rev. Stat. § 13:5109(2).

In line with these requirements, the state maintains a self-insurance fund that is "used only for the payment of losses incurred by state agencies under the self-insurance program.[122]

On the other hand, when the state wishes to isolate itself from judgments against political subdivisions, it has additional statutory mechanisms for doing so. For example, the state of Louisiana cannot be held liable for damage caused by a district attorney, a coroner, an assessor, a sheriff, a clerk of court, a public officer of a political subdivision or of an employee of one of these officials.[123] Importantly, this limitation on the state's liability does not include limitations on liability caused by district court judges or judicial districts.

In addition to statutes isolating the state from judgments against political subdivisions, other statutes explicitly require political subdivisions or their agents to pay money judgments against them. For example, "[a] sheriff and ex officio tax collector shall further pay from the sheriff's salary fund, upon warrant drawn by him, an amount necessary to pay final judgments obtained against his office for its official

---

[122]     *Id.* § 39:1533(a)(1).

[123]     *Id.* § 42:1441(A) ("The state of Louisiana shall not be liable for any damage caused by a district attorney, except as provided in Subsection D of this Section, a coroner, assessor, sheriff, clerk of court, except as provided in Subsection E of this Section, or public officer of a political subdivision within the course and scope of his official duties, or damage caused by an employee of a district attorney, except as provided for in Subsection D of this Section, a coroner, assessor, sheriff, clerk of court, except as provided in Subsection E of this Section, or public officer of a political subdivision.").

acts."[124] And sheriffs are authorized by statute to obtain liability insurance for payment of damages.[125]

Unlike the case with sheriffs, there is no statutory mandate that judicial districts pay final judgments, and no fund is identified as a source of such payments. Moreover, judicial districts are not authorized to obtain liability insurance for tort claims as true entities are. If a judgment were somehow rendered against a judicial district, it presumably would be paid out of the state treasury.

Factor three, the entity's degree of local autonomy, also weighs in favor of viewing the judicial districts as something other than political subdivisions. The judicial districts are geographical areas within which judges apply the law. Those judges are supervised by the state supreme court and are dependent on the state legislature for their salaries and for authorization to establish expense and building funds.[126] The judges en banc, not the judicial district, have control of the judicial

---

[124]  *Id.* § 13:5522(C).

[125]  *Id.* § 13:5560 ("Sheriffs of the parishes of the state of Louisiana are hereby authorized to contract for insurance with any insurance company authorized to do business under the laws of the state of Louisiana to cover loss or damage from any negligent acts of the sheriff or his deputies, in the performance of the duties of his office, the premiums on said insurance to be paid by the sheriff as an expense of his office out of the sheriff's general fund.").

[126]  *See, e.g.,* La. Rev. Stat. §§ 13:996.6 and 996.68.

expense fund and disbursements from it. They are required to have it audited annually, and their audits must be submitted to the legislative auditor.[127] Parish clerks of court and sheriffs collect the funds and deposit them into the judicial expense fund, further reducing the judges' autonomy and independence.[128]

Factor four, whether the entity is concerned primarily with local as opposed to statewide problems, is also properly weighed in favor of viewing district courts as arms of the state. District judges are employees of the state who apply state law under the supervision of the state's supreme court. While venue rules generally keep local disputes at home, those rules exist primarily for the convenience of litigants and can be waived. Insofar as district judges apply state law to the resolution of local problems, they are arms of the state, not of any local governing body.

Factor five, whether the entity has the authority to sue and be sued in its own name, clearly weighs in favor of finding that judicial districts are not legal entities at all, let alone political subdivisions. As discussed above, there is no statute granting such authority to judicial districts or district courts.[129] Moreover, defendants-appellees are unaware of any case in which a judicial district has been a party. District

---

[127]    La. Rev. Stat. § 13:996.6(B).

[128]    *Id.*

[129]    *See supra* Part V.B.2.

courts, on the other hand, have been sued, and as discussed above, courts have uniformly ruled that they lack procedural capacity.[130]

Under the sixth factor, the result is the same. The judicial districts are not authorized by statute to own property. Parishes own the property in which judges carry out their functions.[131] This, too, contrasts with the powers of political subdivisions, who are empowered to own property:

> a sheriff and ex officio tax collector may purchase and equip such real property as is necessary in the performance of his duties, including but not limited to an adequate and safe jail.[132]

All six factors weigh in favor of finding that judicial districts are not political subdivisions. To the extent judicial districts have juridical personality at all, they are component parts of the judicial branch. As such, they are more akin to a state agency than a political subdivision, making the 21st JD entitled to Eleventh Amendment immunity from McLin's state-law claim.

---

[130]    *See supra* Part V.B.3.

[131]    La. Rev. Stat. § 33:4713(A) ("Each parish shall provide and bear the expense of a suitable building and requisite furniture for the sitting of the district court and circuit courts.").

[132]    *Id.* § 13:5522(D).

### D.    McLin failed to state a claim for racial discrimination against Judge Morrison.

#### 1.    McLin's claim fails under Rule 12(b)(6).

McLin asserted claims against Judge Morrison and the 21st JD for alleged racial discrimination. The district court dismissed the claim against Judge Morrison under Rule 12(b)(6), finding that McLin had "not plausibly alleged any differential treatment, which requires allegations establishing that a 'similarly situated' comparator was not fired despite committing nearly the same misconduct."[133] The claim against the 21st JD was mooted by the ruling on procedural capacity, but if it were not moot, it would fail for the same reasons as the claim against Judge Morrison.

McLin complains that the district court imposed a heightened pleading standard. Specifically, she asserts the district court required her to "allege a prima facie case."[134] McLin misunderstands the district court's reasoning. The district court's ruling was faithful to Circuit precedent.

In the civil rights context, as elsewhere, "the ordinary rules for assessing the sufficiency of a complaint apply."[135] A complaint must include "a short and plain

---

[133]    ROA.217.

[134]    McLin Brief, p. 54 (emphasis omitted).

[135]    *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511 (2002).

statement of the claim showing that the pleader is entitled to relief."[136] Although plaintiffs need not submit evidence to establish a prima facie case of discrimination at the pleading stage, they must plead sufficient facts to make their case plausible.[137] As this Court has explained: "it can be helpful to reference that framework [the elements of the claim] when the court is determining whether a plaintiff has plausibly alleged the ultimate elements of a disparate treatment claim."[138] That is precisely what the district court did in dismissing McLin's claim.

In its ruling, the district court began by referencing the elements of a discriminatory discharge claim.[139] The court noted that McLin had satisfied "the first three elements of her claim: she belonged to a protected class (white), excelled at her position, and was nonetheless fired."[140] The district court found, however, that McLin's allegations on the fourth element "sink into the realm of suspicion and innuendo."[141] McLin's "information and belief" allegations lacked the detail needed to make them

---

[136]  *Id.* at 512 (citing Fed. R. Civ. P. 8(a)(2)).

[137]  *Cicalese v. Univ. of Texas Med. Branch*, 924 F.3d 762, 766 (5th Cir. 2019).

[138]  *Id.* at 767.

[139]  ROA.216 ("To make a prima facie case of discriminatory discharge, Plaintiff must plausibly allege that she: (1) is a member of a protected class; (2) was qualified for her position; (3) was subject to an adverse employment action; and (4) was replaced by someone outside the protected class, or, in the case of disparate treatment, shows that others similarly situated were treated more favorably.").

[140]  ROA.216-217.

[141]  ROA.217.

plausible.[142] Such sparse allegations are particularly deficient, the court emphasized, when they are based on matters of public record such as Facebook. The plaintiff could have accessed and pled actual statements made by similarly situated employees but failed to do so.[143] McLin alleged she was singled out for using the term "LPians" to describe the citizens of Livingston Parish and for threatening to "run…over" protesters marching in the wake of the George Floyd murder.[144] Yet she failed to specify any instance in which other employees engaged in similar conduct.[145] To be clear, the problem here was not that McLin used the term "on information and belief." Rather, the factual allegations in her complaint lacked the specificity necessary to make them plausible.

Though McLin suggests otherwise, there is nothing in the district court's ruling demanding that she plead a prima facie case. The court used the elements of the prima facie case as the "framework" for assessing whether McLin had pled "sufficient facts on all the ultimate elements of a disparate treatment claim to make

---

[142]    ROA.217 (citing ROA. 110, ¶ 106: "Specifically, Plaintiff states: upon information and belief, the complainant T.D. (and upon information and belief others) has posted political endorsements online and via Facebook that presumably violate the 21st JDC policy prohibiting such public political endorsements.")

[143]    ROA.217.

[144]    ROA.218.

[145]    ROA.218.

[her] case plausible."[146]

McLin cites *Cicalese v. Univ. of Texas Med. Branch* and suggests the Court should reach the same conclusion here. *Cicalese*, however, is distinguishable. In *Cicalese*, the plaintiffs, a tenured professor who directed the University of Texas medical school's transplant center and a tenure-track faculty member who directed the school's transplant research, alleged that the medical school dean said to them, "What are you doing here? You should go back to Italy," and refused to publicize an "Order of Merit" one of the plaintiffs received from the President of Italy.[147] They also alleged that the chairman of the surgery department said, with respect to Italian Ph.D. students in the plaintiffs' program, he did not care about "these Italians," and he referred to "stupidity" and "failure to understand a situation" as an "Italian thing."[148] The chairman of the surgery department gave one of the plaintiff's titles to "American Doctors who were less qualified than" he was and set a new policy rescinding all permanent faculty licensure waivers—a policy that, according to the plaintiffs, affected only them, and they were both Italian.[149]

---

[146]   *Cicalese v. Univ. of Texas Med. Branch*, 924 F.3d 766 (5th Cir. 2019).

[147]   *Id.* at 764-765.

[148]   *Id.* at 765.

[149]   *Id.*

The facts pled by McLin contrast sharply with the plausible allegations in *Cicalese*. The plaintiffs there alleged actual statements, made by their supervisors, denigrating Italians.  In contrast, McLin does not allege any statements by Judge Morrison or anyone else denigrating white people or suggesting she was fired because she was white. For example, McLin alleges that "Chief Judge Morrison candidly told Ms. McLin 'In today's world that we live in, I have no other choice but to terminate you. You need to watch what you say and do.'"[150] This might be a factual allegation, but it conveys nothing about race.

Instead of pleading actual statements by Judge Morrison, McLin offers speculation about Judge Morrison's inner thoughts when he spoke:

> Ms. McLin—who was there and heard the words, tone, and witnessed Judge Morrison's demeanor—*understood his remarks to mean* he felt compelled to fire Ms. McLin given the overall facts of the matter: she was a white woman, who posted a critical view of civil rights protesters in the wake of George Floyd's murder, and a co-worker, who was black, complained about the post.[151]

Speculation about what another person was thinking does not rise to the level of factual allegation. Unlike *Cicalese,* McLin has not alleged any facts suggesting that she was targeted because of her race.

Elsewhere McLin presents her perceptions as though they were facts:

---

[150]     ROA.115, ¶ 133.

[151]     McLin Brief, p. 24 (emphasis added).

> Implicit in Judge Morrison's words, *at least to Ms. McLin's perception*, was that she would not have been fired if she had offered the same critique but was a race other than white, nor would she have been fired if Ms. McLin, as a white woman, had posted a political view supporting the protesters at issue.

> Ms. McLin *took Judge Morrison's words to mean* she was terminated for her race and for the content of her speech.[152]

Speculation about what Judge Morrison was really thinking is neither an allegation of fact nor a perception. A perception is an observation—something seen or heard; unsupported by allegations of actual conduct, it does not nudge the "claim across the line from conceivable to plausible."[153]

### 2. Even if McLin had stated a claim upon which relief can be granted, Judge Morrison would be entitled to qualified immunity on the race-discrimination claim.

Judge Morrison also asserted qualified immunity against McLin's racial discrimination claim. The district court did not reach the qualified immunity defense because it dismissed the claim for failure to state a claim under Rule 12(b)(6). As with her first amendment retaliation claim, McLin could not point to a case holding that an employer may not terminate an employee for using a term that a coworker perceives as offensive and complains about.[154] Should this Court reverse the district

---

[152]    *Id.* (emphasis added).

[153]    *Ashcroft v. Iqbal*, 556 U.S. 662, 682 (2009).

[154]    *See* ROA.152-153.

court on the Rule 12(b)(6) motion, Judge Morrison re-urges his qualified immunity defense.

### E. Judge Morrison is entitled to qualified immunity on the First Amendment claim.

#### 1. McLin's claim fails unless she meets her burden of showing that Judge Morrison is not entitled to qualified immunity.

The district court was correct to find that Judge Morrison is entitled to qualified immunity from McLin's First Amendment claim.[155] Qualified immunity shields government officials from civil liability in their individual capacity so long as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.[156] It "protects all but the plainly incompetent or those who knowingly violate the law."[157]

"Qualified immunity is an entitlement not to stand trial or face the other burdens of litigation, conditioned on the resolution of the essentially legal question whether the conduct of which the plaintiff complains violates clearly established law.

---

[155]   In addressing Judge Morrison's qualified immunity, McLin also discusses her state-law claim under La. Rev. Stat. § 23:961. McLin, however, did not assert that claim against Judge Morrison. The state claim was against the 21st JD. McLin may not advance a new claim against Judge Morrison for the first time on appeal.

[156]   *Cunningham v. Castloo*, 983 F.3d 185, 190 (5th Cir. 2020).

[157]   *Id.*

The entitlement is an immunity from suit rather than a mere defense to liability."[158] Unless the plaintiff's allegations state a claim of violation of clearly established law, a defendant pleading qualified immunity is entitled to dismissal.[159]

Once raised, a plaintiff has the burden to rebut the qualified immunity defense "by establishing that the official's allegedly wrongful conduct violated clearly established law. We do not require that an official demonstrate that he did not violate clearly established federal rights; our precedent places that burden upon plaintiffs."[160]

The qualified immunity analysis is a two-pronged inquiry. A court can analyze the prongs in either order or resolve the case on a single prong.[161] First, the court asks whether the facts, viewed in the light most favorable to the party asserting injury, show that the official's conduct violated a constitutional right.[162] Second, the court asks whether the right was "clearly established."[163]

---

[158] *Est. of Davis ex rel. McCully v. City of N. Richland Hills*, 406 F.3d 375, 380 (5th Cir. 2005) (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985)).

[159] *Mitchell*, 472 U.S. at 526 (1985).

[160] *Id.* (citing *Pierce v. Smith*, 117 F.3d 866, 871–72 (5th Cir.1997)).

[161] *Cunningham*, 983 F.3d at 190 (5th Cir. 2020).

[162] *Id.* at 190-91.

[163] *Id.* at 191.

The "clearly established" test is demanding.[164] A right is clearly established only if it is sufficiently clear that every reasonable official would have understood that what he is doing violates that right.[165] While a case directly on point is not required, existing precedent must have placed the statutory or constitutional question beyond debate.[166] There must be controlling authority at a sufficiently high level of specificity to put a reasonable official on notice that his conduct is definitely unlawful.[167] The Supreme Court has repeatedly instructed "not to define clearly established law at a high level of generality"[168] and to "frame the constitutional question with specificity and granularity."[169]

### 2.    McLin fails to accept her burden.

McLin must show that Judge Morrison is not entitled to qualified immunity, but she attempts to shift the burden to Judge Morrison: "[D]efendants did not seem to cite to any case in which a public official successfully invoked qualified immunity against a claim of First Amendment retaliation in the workplace."[170] Under this

---

[164]    *Id.*

[165]    *Id.*

[166]    *Id.* (citing *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)).

[167]    *Id.* (citing *Vincent v. City of Sulphur*, 805 F.3d 543, 547 (5th Cir. 2015)).

[168]    *Id.*

[169]    *Id.* at 193 (citing *Morrow v. Meachum*, 917 F.3d 870, 874-875 (5th Cir. 2019)).

[170]    McLin Brief, 63.

Court's precedent, however, the burden is on McLin to demonstrate that the conduct for which she was fired—threatening in a Facebook post to run over Black Lives Matter protesters—is so well-established as a constitutional right that every reasonable official would have known that firing her for it would violate her right. McLin has not met this burden.

### 3.    McLin defines her asserted right too generally.

McLin makes another error. The cases she relies on to establish her asserted right are precisely the "high level of generality" this Court, and the Supreme Court, have repeatedly warned against. McLin cites *Pickering v. Board of Education of Township High School District* for the proposition that "the First Amendment prohibits a public employer from terminating a public employee for speaking 'on issues of public importance.'"[171] *Pickering*, however, framed the constitutional question before it with much more "specificity and granularity" than McLin's quotation suggests: "[W]e hold that, in a case such as this, absent proof of false statements knowingly or recklessly made by him, a teacher's exercise of his right to speak on issues of public importance many not furnish the basis for his dismissal from public employment."[172] The teacher in question had published a letter in a local newspaper criticizing, among

---

[171]    *Id.* (quoting *Pickering v. Bd. of Ed. of Twp. High School District 205, Will County, Il.*, 391 U.S. 563, 574 (1968)).

[172]    *Pickering*, 391 U.S. at 574.

other things, the school board's handling of bond issue proposals and its allocation of resources between the schools' educational and athletic programs.[173]

While a case directly on point is not required, it is a stretch to conclude that *Pickering* puts the question at issue here beyond debate. *Pickering* involved a teacher disagreeing with school board policy on the allocation of funding. Here, an employee in service to the court posted a threatening comment directed toward individuals with whom she disagrees on matters the court could be asked to adjudicate. The factual circumstances confronting the two courts are materially different, and the requirement that constitutional rights be defined and pled with specificity and granularity precludes a finding that *Pickering* settled the debate on whether McLin was exercising a constitutionally protected right.

### 4.    McLin fails to plead facts showing that Judge Morrison violated her right.

McLin fails to demonstrate that the conduct for which she was discharged constituted a "well-established" constitutional right, but that is only half the analysis. The Rule 12 dismissal was predicated on McLin's failure to allege facts that, if proven true, would establish Judge Morrison's conduct—terminating McLin's employment—as a violation of the asserted right.

---

[173]    *Id.* at 566.

The district court's analysis was complex, but the crux of the issue was the third element of the First Amendment retaliation analysis: whether McLin's interest in commenting on matters of public concern outweighed her employer's interest in promoting efficiency.[174] Only if the district court determined that McLin's interest outweighed the judicial district's could it conclude that Judge Morrison's conduct violated McLin's right. This is a question of law that must be framed with "specificity and granularity."

Against this backdrop, McLin complains the district court erred in finding she had not pled sufficient facts to meet her burden. McLin misunderstands the nature of the inquiry. She asserts that "she must eventually produce facts that demonstrate her interests to engage in political speech on social media in the context of the case outweighed Judge Morrison's interest in promoting efficiency."[175] The posture of the case—a qualified immunity analysis at the Rule 12(b)(6) stage—did not require McLin to "eventually produce facts." Rather, it required her to show that, as a matter of law, the facts she has pled, if true, are sufficient to overcome qualified immunity.

---

[174]    ROA.221, order and ruling ("'To prevail on a § 1983 claim, a public employee must establish the following: (1) she suffered an adverse employment action; (2) her speech involved matters of public concern; (3) her interest in commenting on matters of public concern outweighs the employer's interest in promoting efficiency; and (4) her speech motivated the employer's adverse action.' Here, Plaintiff's allegations satisfy the first, second, and fourth elements of her claim.") (citing *Modica v. Taylor*, 465 F.3d 174, 179-80 (5th Cir. 2006)).

[175]    McLin Brief, p. 65.

In determining whether McLin's interest in speech outweighed the government's interest in promoting efficiency, the district court, relying on this Court's precedent, considered several factors. These factors included whether the statement (1) impairs discipline by superiors or harmony among coworkers; (2) has a detrimental impact on close working relations for which personal loyalty and confidence are necessary; or (3) impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise. The district court also considered (4) the degree to which the employee's activity involved a matter of public concern; (5) the time, place, and manner of the employee's activities; and (6) whether the employee's activity may be characterized as hostile, abusive, or insubordinate.[176]

McLin asserts that the district court's application of these factors to her complaint amounted to "findings of fact" and was impermissible under Rule 12(b)(6). McLin is mistaken. The district court's conclusions are based on consideration of her allegations in light of these factors, not on findings of fact.

With respect to the first factor, whether McLin's statement impairs discipline by superiors or harmony among coworkers, the district court rightly asked, "why would 'T.D.' have reported the post to her supervisor (Judge Edwards) who, in turn

---

[176]     ROA.222, order and ruling (citing *Johnson v. Louisiana*, 369 F.3d 826, 831 (5th Cir. 2004) and *Brady v. Fort Bend Cnty.*, 145 F.3d 691, 707 (5th Cir. 1998)).

made a complaint to Chief Judge Morrison?"[177] McLin's assertion that she did not plead that her actions "weakened workplace moral and impaired harmony among coworkers" is contradicted by other allegations in the complaint. There was no finding of fact here, only a consideration of allegations in the complaint considering Fifth Circuit precedent.

In applying the third factor, whether McLin's statement jeopardized the regular operation of the state court, the district court rightly noted that the "judicial branch depends upon the confidence of the people it serves, without which it cannot serve its paramount purpose of providing a fair and impartial open forum in which the public may resolve its disputes."[178] The district court also noted that even the appearance of partisanship in the administration of justice undermines the judicial branch's mission.[179] This is not a finding of fact, but an assessment of how McLin's threat could impact the court's standing as an impartial arbiter of justice. The district court rightly weighed this factor against McLin.

Factor five required the district court to consider the time, place, and manner of the employee's activity. Given that the post was made in the aftermath of George Floyd's death and the protests it sparked, the conclusion that it "was optimized to

---

[177]    ROA.224.

[178]    ROA.224.

[179]    ROA.224.

invoke outrage and to undermine public confidence in the impartiality of the 21ˢᵗ JD on the issue of protester tactics" was reasonable. Courts were being asked to adjudicate cases involving protesters' tactics and officials' responses to them. The district court rightly weighed McLin's threat in favor of the Judge Morrison's interest in promoting efficiency.

Finally, factor six, whether McLin's statement can be characterized as hostile, abusive, or insubordinate, also weighs in favor of the government's need to promote efficiency. The district court concluded that McLin's Facebook post— "All I'm going to say is that Silver Duramax enjoys pulling that black horse trailer at 80 mph 🥰 #IWillrunYouOver"— "provides no analysis or opportunity for dialogue. It issues a threat."[180] This is not a factual finding but a legal conclusion reached through the application of this Court's framework.  This factor weighs against finding that McLin's interest in speech outweighs the government's interest in promoting efficiency.

McLin's conclusion that "Chief Judge Morrison would eventually be entitled to qualified immunity if Ms. McLin could not make out the elements of her claim" is wrong and strips qualified immunity of its meaning. In McLin's view, Judge Morrison must win on the merits before he would be entitled to qualified immunity.

---

[180]    ROA.223.

That's incorrect. But Judge Morrison is entitled to avoid discovery and a trial if McLin did not sufficiently show that he violated a clearly established constitutional right. McLin has not done that. The district court should be affirmed.

## VI.    CONCLUSION

The district court properly dismissed McLin's claims against the 21st JD:

- McLin's disparate treatment and state-law claims against the 21st JD were rightly dismissed because the 21st is not a juridical person and lacks the capacity to sue or be sued.

- In the alternative, even if the 21st JD possessed juridical personality, it would be immune from state-law claims in federal court under the Eleventh Amendment.

McLin's claims against Judge Morrison are equally without merit:

- McLin's race-discrimination claim lacked the specificity to make it plausible under Rule 12(b)(6).

- And Judge Morrison is entitled to qualified immunity on the free-speech claim. McLin failed to show a "well established" constitutional right or its violation.

The district court was correct to dismiss this action against the 21st JD and Judge Morrison. This Court should affirm.

Respectfully submitted,

*/s/ Thomas M. Flanagan*

Thomas M. Flanagan (La. Bar #19569)
Camille E. Gauthier (La. Bar #34558)
Dennis O. Durocher, Jr. (La. Bar #36441)
FLANAGAN PARTNERS LLP
201 St. Charles Avenue, Suite 3300
New Orleans, Louisiana 70170
Telephone: (504) 569-0235
tflanagan@flanganpartners.com
cgauthier@flanaganpartners.com
ddurocher@flanaganpartners.com

Counsel for Defendants-Appellees, Twenty-
First Judicial District and Robert H.
Morrison, III

## CERTIFICATE OF SERVICE

I hereby certify that a copy of this brief was served on all counsel of record this 12th day of December, 2022, by e-filing same into the CM/ECF system, which will automatically deliver a copy of same to Kevin Vogeltanz, counsel for plaintiff-appellant

<u>/s/ Thomas M. Flanagan</u>

## CERTIFICATE OF COMPLIANCE

1.    This brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B) because this brief contains 12,670 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced 14-point Equity Text A typeface using Microsoft Word.

*/s/ Thomas Flanagan*